No. 13-11305

IN THE
# United States Court of Appeals for the Fifth Circuit

RALPH S. JANVEY, IN HIS CAPACITY AS COURT-APPOINTED RECEIVER
FOR THE STANFORD INTERNATIONAL BANK, LTD., ET AL; OFFICIAL
STANFORD INVESTORS COMMITTEE,

Plaintiffs-Appellants,

v.

TGC, L.L.C., DOING BUSINESS AS GOLF CHANNEL,

Defendants-Appellees.

On Appeal from the United States District Court for the
Northern District Of Texas, Dallas Division
Civil Action No. 3:11-Cv-294
Honorable David C. Godbey, Presiding

**APPELLEE TGC, LLC D/B/A GOLF CHANNEL'S
PETITION FOR PANEL REHEARING**

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-0466

THEODORE W. DANIEL
KYLE M. SCHINDLER
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201
(214) 855-8000

KATHERINE D. MACKILLOP
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, TX 77010-3095
(713) 651-5151

Counsel for Appellee, TGC, LLC d/b/a
GOLF CHANNEL

March 25, 2015

# TABLE OF CONTENTS

                                                               **Page**

TABLE OF AUTHORITIES ................................................................................ ii

SUMMARY OF GROUNDS FOR REHEARING .................................................. 1

ARGUMENT AND AUTHORITIES ..................................................................... 3

      I.     THE PANEL DECISION CONFLICTS WITH *BROWN* ................... 3

            A.     Under *Brown* And TUFTA, A Good Faith Transfer Has Value If The Transferee Has A Claim Or Right To Payment ......................................................................................... 4

            B.     There Is No Ponzi Scheme Exception To The Definition Of Value .............................................................................................. 7

      II.    THIS CASE INVOLVES AN ISSUE OF EXCEPTIONAL IMPORTANCE THAT THREATENS LEGITIMATE COMMERCIAL TRANSACTIONS IN THIS CIRCUIT AND ELSEWHERE .................................................................................. 12

      III.   THE COURT SHOULD AFFIRM THE JUDGMENT BUT MAY ALSO CERTIFY THE QUESTION TO THE TEXAS SUPREME COURT ....................................................................... 14

CONCLUSION .................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Austin v. Kroger Texas L.P.*,
   746 F.3d 191 (5th Cir. 2014) .................................................................14, 15

*Donnel v. Kowell*,
   533 F.3d 762 (9th Cir. 2008) ..............................................................................4

*In re Financial Federated Title & Trust*,
   309 F.3d 1325 (11th Cir. 2002) .................................................................11, 12

*In re Hedged-Inv. Assocs., Inc.*,
   84 F.3d 1286 (10th Cir. 1996) ............................................................................4

*Janvey v. Brown*,
   767 F.3d 431 (5th Cir. 2014) ....................................................................*passim*

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*,
   699 F.3d 848 (5th. Cir. 2012) ...........................................................................14

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) ................................................................................4

*In re Universal Clearing House Co.*,
   60 B.R. 985 (D. Utah 1986) ..............................................................................12

*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) .........................................................................5, 8

**Rules and Statutes:**

Fed. R. App. P. 40(a) .................................................................................1, 12

Tex. Bus. & Com. Code § 24.002(3) ..............................................................4, 6

Tex. Bus. & Com. Code § 24.002(5) ..............................................................4, 6

Tex. Bus. & Com. Code § 24.004(a) ..............................................................4, 7

Tex. Bus. & Com. Code § 24.009(a) ..........................................................3, 4, 7

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Tex. R. App. P. 58 ........................................................................................................ 14

Tex. R. App. P. 58.1 ..................................................................................................... 15

Unif. Fraudulent Transfer Act § 3 cmt. 2 .................................................................... 10

**Other Authorities:**

Jay Adkisson, *Fifth Circuit Slices The Golf Channel Into The Pond,*
    FORBES, March 18, 2015 ........................................................................................ 7

John Council, *Golf Channel Bogeys Attempt to Keep Millions
    Received From R. Allen Stanford*, Texas Lawyer, March 17, 2015 .................... 14

## SUMMARY OF GROUNDS FOR REHEARING

Pursuant to Fed. R. App. P. 40(a), appellee TGC, LLC d/b/a Golf Channel ("Golf Channel") petitions for rehearing because the panel misapprehended *Janvey v. Brown*, 767 F.3d 431 (5th Cir. 2014), which was decided after oral argument in this case and not previously briefed by the parties.

*Brown* involved the same issue as this case: whether payments made by Stanford Financial entities ("Stanford"), were voidable under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). *Brown* held that interest payments to Stanford investors were voidable because their investment contracts were illegal and unenforceable and thus not antecedent debts. But the Court also held, in language apparently overlooked by the panel in this case, that repayments made to investors in the Stanford scheme were ***not*** voidable under TUFTA because the payments were "payments of an antecedent debt." *Id*. at 443. Thus, even though the investors' contributions had served only to perpetuate the Ponzi scheme and deepen Stanford's insolvency, the Stanford receiver could not recoup them because the investors had a lawful, enforceable claim to retain those amounts.

The decision in this case cannot be squared with the binding precedent of *Brown*. The panel held that Golf Channel's services had "no value" because they unwittingly furthered an insolvent Ponzi scheme. Slip op. 8-9. But *Brown* holds that the investments ***themselves*** had value within the meaning of TUFTA because,

1

even though they deepened Stanford's insolvency, they offset lawful debts owed to the investors.  Under *Brown*—which accords with the decisions of other Circuits that have addressed the issue—Golf Channel's services necessarily had value because its contractual rights were lawful and valid and created an antecedent debt satisfied by the payments the Receiver seeks to recover.

Rehearing is further warranted because the panel's error, if not corrected, will negatively affect commercial transactions in this Circuit and elsewhere.  The panel held that an innocent merchant that fully performed a valid, lawful contract must repay its entire consideration because it unknowingly dealt with, and thus unwittingly furthered the insolvency of, a fraudulent enterprise.  This holding will severely chill legitimate commercial transactions  It imposes an impossible duty on innocent merchants to scrutinize each company they do business with to try to learn if it is engaged in unrelated fraud, and subjects them to the risk of having to disgorge their lawful compensation if it is later discovered that the company was engaged in a Ponzi scheme or similar fraud.  Those who enter into illegal, unenforceable contracts with Ponzi operators cannot expect to profit from them.  But innocent merchants (and employees) who lawfully provide valuable goods and services in the ordinary course of business should not run the risk of ruin merely because their counterparty was, unbeknownst to them, engaged in fraud.

## ARGUMENT AND AUTHORITIES

I. **THE PANEL DECISION CONFLICTS WITH *BROWN*.**

Golf Channel seeks rehearing because the panel decision, while citing *Brown*, appears to have misapprehended the basis for that decision, which was decided after oral argument in this case and not previously addressed by the parties. Both *Brown* and this case address the same issue: whether parties to whom Stanford paid money have a defense to a fraudulent transfer claim because the transfers were for "reasonably equivalent value." Tex. Bus. & Com. Code § 24.009(a). *Brown* held that investors in the Stanford scheme whose contributions were repaid could not be required to disgorge those amounts because they were in exchange for valid debts. *Brown*, 767 F.3d at 443. But without citing that specific holding, the panel in this case held that an innocent merchant that performed a market-value contract in the ordinary course of business must return every cent of consideration because the contract unwittingly furthered Stanford's fraudulent activities and thus was purportedly valueless. Properly considered, *Brown*'s holding should have led to affirmance of the district court. A party to an illegal contract with a Ponzi scheme cannot profit from it. But the statute protects good faith transferees that receive market-rate payments in satisfaction of valid debts.

### A. Under *Brown* And TUFTA, A Good Faith Transfer Has Value If The Transferee Has A Claim Or Right To Payment.

Under the statute, one who receives a payment in good faith has a valid defense to a fraudulent transfer if that transferee gave something of "reasonably equivalent value" in exchange. Tex. Bus. & Com. Code § 24.009(a). "Value" is given "if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . ." *Id.* § 24.004(a). A "debt" means a liability on a "claim," which in turn means "a right to payment or property." *Id.* §§ 24.002(3), (5). Thus, the statute unequivocally provides that a good faith transfer is in exchange for value if it satisfies a valid right to payment.

Applying the statutory language, this Court in *Brown* held that investors in the Stanford scheme who received repayments of their investments were entitled to retain those amounts because the repayments were "payments of an antecedent debt"—namely, the investors' fraud claims against Stanford. 767 F.3d at 443. This holding accords with the holdings of other circuits applying the nearly identical language of other state fraudulent transfer statutes and the Bankruptcy Code in the context of Ponzi schemes. *See*, *e.g.*, *Donnel v. Kowell*, 533 F.3d 762, 772 (9th Cir. 2008); *In re Hedged-Inv. Assocs., Inc.*, 84 F.3d 1286, 1289-90 (10th Cir. 1996); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995).

The *Brown* investors, however, were not entitled to retain purported "interest" payments from the fraudulent CDs because those contracts were illegal and unenforceable and payment under those contracts therefore did not satisfy any antecedent debt. *Brown*, 767 F.3d at 440-41. This holding comported with this Court's prior decision in *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006), which disallowed a broker's claim to illegal "commissions" purportedly owed in connection with a Ponzi scheme, "because the investor-defendants have no claim for contractual interest from a Ponzi scheme." *Brown*, 767 F.3d at 442.

Under *Brown* and *Warfield*, the question of value exchange turns on whether the transferee had a preexisting claim, such that payment of that claim satisfies a valid debt owed by the debtor's estate. *Brown*, 767 F.3d at 440-43. If payment is made for a legal and enforceable contract (or, as with the investors' principal, a valid claim for restitution), the payment exchanges "value" by definition. Thus, the Court in *Brown* agreed with the district court in that case that the investors "did give reasonably equivalent value to the extent that they received back their principal because they have actionable claims for fraud and restitution." *Id*. at 441.

Under this holding, the market-rate payments made to Golf Channel under its valid contract, like the investors' principal repayments, were in exchange for value because Golf Channel had an enforceable claim to the payments. There is no argument that Golf Channel's contract was illegal or unenforceable, as were the

5

broker's contract in *Warfield* and the investors' claim to interest in *Brown*.[1] To the contrary, the panel noted that Golf Channel's services "may have been quite valuable to the creditors of a legitimate business" and "are of substantial value" to Golf Channel, and held that Golf Channel remains a valid Stanford creditor that "must wait its turn for a pro rata share of whatever remains in the estate." Slip op. at 8-9 n.8. Yet even though the panel recognized that Golf Channel is a creditor that continues to have a valid (albeit unsecured) claim under its contract, the panel nonetheless held that Golf Channel must return the entire $5.9 million received for its valuable services under that same contract.

That internally inconsistent holding cannot be squared with *Brown* or the plain language of TUFTA. Golf Channel fully performed under its contract. ROA.303-04, 312-13, 326-27. Golf Channel had a "claim"—defined by the statute as a "right to payment," Tex. Bus. & Com. Code § 24.002(3)—for each payment that it received under the contract. The amounts owed under that "claim" constituted "debt," defined as "a liability on a claim," *id*. § 24.002(5). Thus, the payments under that contract had reasonably equivalent "value" under TUFTA

---

[1] Golf Channel's contract was legal, enforceable, and negotiated at arm's length for market rates. ROA.271, 281-82, 300-08, 310, 317-20, 331, 350, 5958. The Receiver did not allege that the contract is void or unenforceable, and did not dispute that point when Golf Channel asserted it as a key distinction between this case and cases such as *Warfield*. *See* Br. for Appellee 25; *compare* ROA.271, 281-82, 301-08, 5958 *with* ROA.184-99, 375-403, 5481-5502, 5908-18.

6

because they "satisfied" that "antecedent debt," *id*. § 24.004(a), and because they were indisputably made at market value and received in good faith, *id*. § 24.009(a).

In fact, Golf Channel should have an even stronger entitlement to retain its payments than the investors did to their principal contributions in *Brown*. Whereas the investors had only an inchoate, unadjudicated restitution claim, Golf Channel had a valid, enforceable contract. And whereas the investors invested in something they arguably should have known was too good to be true, Golf Channel had no reason to know of Stanford's fraud. As one commentator has noted, the panel's decision "effectively elevated" the investors "to a higher level of creditors who have a greater chance of recovering transfers" than do "ordinary and innocent merchants, such as … the Golf Channel in this case." Jay Adkisson, *The Fifth Circuit Slices The Golf Channel Into The Pond*, Forbes, March 18, 2015 (http://onforb.es/1EuSMaU). This "has the potential to disrupt the normal business expectation of merchants." *Id*.

### B. There Is No Ponzi Scheme Exception To The Definition Of Value.

Under *Brown*, a good faith transferee that receives payments in satisfaction of an antecedent debt has a valid defense to a fraudulent transfer claim. Under the panel's decision, by contrast, the viability of the defense depends on whether the transferor is—unbeknownst to the transferee—engaged in a fraudulent scheme. That holding is inconsistent with both *Brown* and the statute, and would impose

7

unwarranted and unprecedented obligations on good faith merchants to scrutinize the internal affairs of every company with which they deal.

The panel held that because "Ponzi schemes by definition create greater liabilities than assets with each subsequent transaction," Golf Channel's services necessarily provided no value under TUFTA as measured from the creditors' perspective. Slip op. 9. Although the panel agreed that "consumables and speculative investments can have value," it held that "the case before us is different because Stanford was engaged in a Ponzi scheme, not a legitimate enterprise." *Id*. at 10 n.9. The panel interpreted *Warfield* as holding that "[b]ecause the debtor's business was inherently illegitimate, the broker's services, which furthered the scheme, had no value as a matter of law." *Id*. at 7 (citing *Warfield*, 436 F.3d at 560).[2]

This analysis cannot be squared with *Brown*. Neither *Brown* nor *Warfield* turned simply on whether the exchange furthered the Ponzi scheme. If the test of value were only whether services rendered in exchange for a transfer "furthered" an "inherently illegitimate" scheme, the investors in *Brown* could not have retained their principal repayments, because no exchange more directly furthers a Ponzi

---

[2] The panel stated that "Golf Channel failed to proffer any evidence showing that its advertising services provided equally equivalent value from the standpoint of Stanford's creditors … ." Slip op. 1. The panel's decision, however, turned on its legal conclusion that the services lacked any value "as a matter of law." *See id*. at 8. The Panel acknowledged that Golf Channel provided evidence of the market value of its services. *Id*. Its conclusion that the services had no value was one of law, not of fact. *Cf. id*. at 6 n.4 (noting that if there is some value, whether that value is reasonably equivalent to transfer is reviewed for clear error).

scheme than another investment.  Each new investment perpetuated and extended the Stanford Ponzi scheme.  In the panel's words, it *"**decreased** the value of the estate by creating a new liability that the insolvent business could never legitimately repay."*  Slip op. 9 (emphasis in original).  Nonetheless, the principal repayments were valid, and not subject to disgorgement, because they compensated for a lawful debt.  In contrast, the interest payments were ***not*** valid, and ***were*** subject to disgorgement, because, like the commissions for the purported broker services in *Warfield*, they were made pursuant to illegal contracts.

The panel's singular focus on the nature of Stanford's activities also finds no support in the language of the statute.  The panel's holding correctly notes that "TUFTA makes no distinction between different types of services or different types of transferees," yet it concludes from this fact that "[w]e have no authority to create an exception for 'trade creditors.'"  Slip op. 9.  In fact, Golf Channel does not seek any exception, but rather seeks to be treated on equal terms with investors or any other good faith transferee.  By definition, the fact that Golf Channel was paid under a valid "claim" satisfies any burden to show "value."  *See supra* at 7.

The panel relied on a comment to the Uniform Fraudulent Transfer Act ("UFTA") stating that courts should determine value "in light of the purpose of the Act to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors.  *Consideration having no utility from a creditor's viewpoint*

9

*does not satisfy the statutory definition.*" Slip op. 7 (quoting UFTA § 3, cmt 2) (emphasis the Court's). There are two problems with that reliance. First, neither the TUFTA statute nor the UFTA comment differentiates between different types of good faith transferees. Yet, if the current holding in this case remains in effect, this Circuit's fraudulent transfer jurisprudence will favor investors (who retain their repayment of principal under *Brown*) at the expense of all other innocent, good faith creditors who happen to conduct ordinary business with a Ponzi scheme (who must now disgorge all payments). Second, even assuming *arguendo* that the analysis should be done solely "from a creditor's viewpoint" despite the absence of any such directive in the statutory text, the payments to Golf Channel **did not** improperly deplete the Stanford estate, whether measured from the perspective of creditors or anyone else. The payments to Golf Channel directly offset a valid, $5.9 million contractual obligation that would otherwise be a debt of the estate. That constituted value as expressly defined by TUFTA. *See supra* at 6-7.

    Not only is the panel's ruling inconsistent with *Brown*, but its interpretation of value has no apparent limiting principle, as the nature of a Ponzi scheme ensures that virtually any service rendered will in some way further the scheme. To the extent Golf Channel's air time was used by Stanford to further its Ponzi scheme, so too were investment principal, electricity, gas, water, Internet, leased building space, telephone service, office supplies, professional services, mail room staff

labor, and any other consumable good or service purchased by Stanford from vendors or trade creditors in the ordinary course of business. All these merchants, as well as innocent employees such as administrative personnel, are in danger of having their lawful consideration or wages disgorged years after they were paid.

Indeed, it is difficult to conceive of any transaction, outside of a physical asset that remains when a receiver or trustee is appointed, that would meet the panel's definition of value. The panel stated that "one can imagine an electricity provider putting on evidence that its services helped preserve the building in which the debtor operated, preventing the building's deterioration to the benefit of the debtor's creditors." Slip op. 8 n.7. But that speculation only underscores the unprecedented breadth of the ruling. Businesses, including fraudulent operators like Stanford, use electricity and other services primarily to further their business activities (for example, by operating computers and lighting the workplace) rather than to preserve physical assets. Thus, unless a merchant could make the kind of extraordinary (and unlikely) showing hypothesized by the panel, its consideration would be invalid and subject to disgorgement.

As the Eleventh Circuit has recognized, such a rule threatens legitimate transactions. In *In re Financial Federated Title & Trust*, 309 F.3d 1325, 1332 (11th Cir. 2002), the court rejected the view—now adopted by the panel in this

11

case—that any services that further a Ponzi scheme and deepen its insolvency are necessarily without value. The court endorsed an earlier court's reasoning that

> [t]he fact that the services appellants performed increased the debtors' insolvency does not preclude a determination that the appellants gave value. By definition, a Ponzi scheme is driven further into insolvency with each transaction. Therefore, by the trustee's reasoning, no one who in any way dealt with, worked for, or provided services to the debtors could prevent avoidance of any transfers they received. The debtors' landlord, salaried employees, accountants and attorneys, and utility companies that provided services to the debtors all assisted the debtors in the furtherance of their fraudulent scheme. In spite of this fact, we do not think that the goods and services that these persons and entities provided were without value or that transfers to them could be set aside as fraudulent conveyances.

*Id.* (quoting *In re Universal Clearing House Co.*, 60 B.R. 985 (D. Utah 1986)).

Golf Channel therefore respectfully seeks rehearing because the panel appears to have overlooked and misapprehended a key holding of *Brown*, which was not previously briefed by the parties. *See* Fed. R. App. P. 40(a)(2) (rehearing appropriate if panel "overlooked or misapprehended" point of law).

## II. THIS CASE INVOLVES AN ISSUE OF EXCEPTIONAL IMPORTANCE THAT THREATENS LEGITIMATE COMMERCIAL TRANSACTIONS IN THIS CIRCUIT AND ELSEWHERE.

The panel's decision is unprecedented. Neither party has identified a single other fraudulent transfer decision that voided payments to a merchant conducting its ordinary business in good faith merely because its goods or services unwittingly furthered a Ponzi scheme. In fact, Golf Channel has identified no other case where

a trustee or receiver even brought such an action. And the panel's decision, if not corrected, threatens to chill a wide range of legitimate commercial transactions

The district court in this case correctly recognized the significant negative consequences for legitimate merchants that would result from the rule eventually adopted by the panel:

> [T]he Receiver's position would shift the risk of loss, and the corresponding duty to investigate, from investors and brokers to trade creditors. It is impractical to expect trade creditors to conduct a forensic investigation into the business of all their customers in the ordinary course of business. On the other hand, investors (or their advisors) should assess the risk of their investment and the corresponding potential reward as a matter of course.

ROA.6504.

As a result of the panel's decision, legitimate merchants will run the risk of losing their entire consideration—years after the fact—if they unknowingly deal with an enterprise that is conducting a fraudulent scheme. Merchants, particularly those with contracts of significant value, will be required either to conduct audits of all their customers or curtail their dealings. Either way, legitimate transactions and efficient economic activity will suffer. This is precisely what the good faith transferee exception of TUFTA and similar laws seek to avoid. Indeed, as the district court noted, if this kind of risk and vetting obligation should be imposed on anyone, it should have been on the investors, not innocent merchants. *Id*.

The issue, moreover, has widespread impact. The Stanford Ponzi scheme was "one of the largest in U.S. history," *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 699 F.3d 848, 851 n.1 (5th. Cir. 2012), and the panel's decision "affects more than $40 million in claims" brought by the receiver in other actions. John Council, *Golf Channel Bogeys Attempt to Keep Millions Received From R. Allen Stanford*, TEXAS LAWYER, March 17, 2015 (www.texaslawyer.com/id=1202720813058/Golf-Channel-Bogeys-Attempt-to-Keep-Millions-Received-From-R-Allen-Stanford?mcode=1202615604418&slreturn=20150217155805). And the impact is not just limited to the Stanford cases. As noted, it will potentially affect a wide range of legitimate transactions conducted in this Circuit.

### III. THE COURT SHOULD AFFIRM THE JUDGMENT BUT MAY ALSO CERTIFY THE QUESTION TO THE TEXAS SUPREME COURT.

For the foregoing reasons, the Court should grant rehearing, vacate the panel opinion, and affirm the district court's judgment. But in the alternative, the Court, upon rehearing, could withdraw the panel opinion and exercise its discretion to certify a controlling question of law to the Texas Supreme Court. Although Golf Channel believes that both the governing statute and *Brown* are clear and require affirmance, certification would also be appropriate under Tex. R. App. P. 58.

The Court employed a similar procedure in *Austin v. Kroger Texas L.P.*, 746 F.3d 191 (5th Cir. 2014). There, the appellee sought rehearing en banc from a

panel decision and also sought certification for the first time. The panel then withdrew its prior opinion and certified a controlling question to the Texas Supreme Court in light of an "arguable conflict" between two different lines of intermediate state appellate court authority. *Id*. at 204. Certification would similarly be appropriate in this case given the conflicting panel decisions and the lack of any Texas case law—much less a controlling Texas Supreme Court decision, *see* Tex. R. App. P. 58.1—interpreting TUFTA's definition of "value" in the context of a good faith transferee of a Ponzi scheme.

## CONCLUSION

The Court should grant rehearing and either affirm the district court's judgment or certify the question to the Texas Supreme Court.

| | |
|---|---|
| JONATHAN S. FRANKLIN<br>NORTON ROSE FULBRIGHT US LLP<br>801 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20004<br>(202) 662-0466 | Respectfully submitted,<br><br>/s/ Theodore W. Daniel<br>Theodore W. Daniel<br>Kyle M. Schindler<br>NORTON ROSE FULBRIGHT US LLP<br>2200 Ross Avenue, Suite 3600<br>Dallas, Texas 75201<br>(214) 855-8000<br><br>Katherine D. Mackillop<br>NORTON ROSE FULBRIGHT US LLP<br>1301 McKinney, Suite 5100<br>Houston, TX 77010-3095<br>(713) 651-5151<br><br>Counsel for Appellee, TGC, LLC d/b/a<br>GOLF CHANNEL |
| March 25, 2015 | |

15

# CERTIFICATE OF SERVICE

I certify that on March 25, 2015 a copy of this document was filed using the U.S. Court of Appeals for the Fifth Circuit's ECF/CM system and all counsel of record listed below were served using the court's electronic Notice of Docket Activity pursuant to 5th Cir. R. 25.2.5.

| | |
|---|---|
| Douglas J. Buncher | Kevin M. Sadler |
| Negligan Foley, LLP | Baker Botts L.L.P. |
| 325 N. St. Paul, Suite 3600 | 98 San Jacinto Blvd., Suite 1500 |
| Dallas Texas 75201 | Austin, Texas 78701 |

/s/ Theodore W. Daniel
Theodore W. Daniel